## Richmond

### CARTER & OTHERS .V. THORP.

#### January 16, 1913.

1. ` VENDOR AND PURCHASER—*Prior Unrecorded Contract—Notice.*—The burden of proving that a purchaser of land had notice of a prior unrecorded contract for the sale of the timber on the land to another person is on him who alleges such notice and, while the fact of notice may be inferred from circumstances as well as proved by direct evidence, the proof must be such as to affect the conscience of such purchaser and be so strong and clear as to fix upon him *mala fides*. In the case in judgment the conduct of the purchaser, taken in connection with the evidence in the case, leads irresistibly to the conclusion that he had actual notice of the contract for the sale of the timber on the land before he completed his contract of purchase.

Appeal from a decree of the Circuit Court of Southampton county. Decree for the complainant. Defendants appeal.

*Affirmed.*

The opinion states the case.

*Robert W. Withers,* for the appellants.

*John N. Sebrell, Jr.,* for the appellee.

CARDWELL, J., delivered the opinion of the court.

This litigation arises out of the following state of facts: In 1906 S. J. Myrick was the owner of three adjoining or contiguous tracts of land, known, respectively, as the "Barrett Place," the "Butler tract" and the "Home Place,"

·situated in Southampton county, and containing in the aggregate about 400 acres. The standing timber upon these farms, of certain dimensions on the stump, was by verbal agreement entered into in October, 1906, sold by Myrick to T. H. Barrett,· V. D. Thorp and W. D. Thorp jointly, to be cut and removed within a specified time, and a written contract pursuant to the verbal agreement was duly executed by Myrick and wife and delivered to T. H. Barrett, V. D. and W. D. Thorp on December 14, 1906, which contract was later assigned by the other two parties interested to V. D. Thorp. After negotiations, extending over several months, W. T. Carter bought of S. J. Myrick the "Home Place" and the "Bulter tract," containing together about 307 acres, and by deed executed on the 27th day of December, 1906, Myrick and wife, in consideration of $4,000 in hand paid, conveyed the said two farms to Carter and wife jointly, which deed was recorded on January 7, 1907, in the clerk's office of Southampton county. On the first day of January, 1907, Carter and wife took possession of and moved upon the lands conveyed to them by Myrick and wife. Neither at this time, nor until nearly two years later, was the contract under which V. D. Thorp claimed title to the timber upon the lands in question recorded. A few days after Carter and wife took possession of the lands conveyed to them by Myrick and wife, Thorp carried his mill upon these lands and located the same thereon, pursuant to his contract of purchase of the timber from Myrick, giving him the use of ten acres of land, to be selected on the "Butler tract," for the purpose of locating the sawmill, sheds, stables, etc., and at the time of the location of the mill plant Carter, then living on the land only about a mile distant from the location selected by Thorp, not only did not contest the right of Thorp to so locate his mill, but assisted him in the selection of a site therefor, and assured Thorp that it would

not be necessary for him to restrict himself to the ten
acres provided for in the contract, but might take all the
land that he might deem necessary. Thorp located his
mill plant on the "Butler tract" and proceeded to cut the
timber there and to manufacture the same into lumber,
and although Carter was almost a daily visitor to the saw-
mill and was "laughing and talking" with those who were
cutting the timber, and even purchased and paid for part
of the lumber manufactured from timber cut off the land
conveyed to him by Myrick, and upon which he was then
living, he laid no claim whatever to this timber. Thorp
continued to cut the timber until he had cut nearly all of
it, covering a lapse of time certainly more than a year and
a half, and it was more than two years from the date of
Thorp's location of his sawmill plant on the land before
he (Carter) set up any claim to the timber thereon, or
objected to Thorp's cutting and removing it. When Carter
did make claim to the timber in question, some time in the
fall of 1909, he, by threats of violence, drove Thorp's em-
ployees, who had gone upon the premises to finish cutting
the timber, away, and by threats of violence to them kept
them off the land; whereupon, Thorp filed his bill in this
cause against Carter and wife, praying for an injunction
restraining the defendants, their agents, etc., from inter-
fering with the plaintiff, or his employees or servants, in
cutting and removing the timber in question, which the
plaintiff claimed he had the right to cut and remove pur-
suant to his contract of purchase thereof from Myrick, of
which contract and his rights thereunder it was alleged
that Carter, who acted for himself and wife, had actual
notice before he purchased and took a conveyance to him-
self and wife from Myrick of the lands upon which this
timber stood.

The defendants filed their answer to the bill, denying
the allegations thereof and asking that their answer be

treated as a cross-bill, in which they prayed a recovery against Thorp of $1,500 "as damages for trespassing upon their lands and cutting and removing timber therefrom, and for use and occupancy of a part of said lands."

The cause having been matured upon the bill of complaint and the exhibits therewith filed, the answer and cross-bill of the defendants, together with exhibits therewith filed, and upon the depositions of witnesses on behalf of both complainant and defendants duly taken and filed, it was submitted to the judge of the circuit court for decision and decree in vacation, who entered the decree, which is before us for review on appeal therefrom taken by the defendants below, adjudging that the complainant, V. D. Thorp, is entitled to the timber in question, and enjoining and restraining perpetually the defendants, their agents, etc., from interfering in any manner whatsoever with the complainant, Thorp, in cutting and removing the said timber according to the conditions in his contract of purchase contained, and during the period provided for in said contract, as well as that provided for by decree theretofore entered in the cause to the effect that by reason of the interference on the part of the defendants with the complainant's right to cut and remove the timber, the latter is entitled to a reasonable extension of the time for cutting and removing the same after that provided for in his contract of purchase expires.

As has been stated, the contract of purchase of the timber in question, under which appellee claims the right to cut and remove it, was not recorded in the clerk's office of Southampton county until after appellants had become complete purchasers of the land upon which the said timber was located and standing; therefore, the sole question presented is whether or not appellants had actual notice of appellee's right to the timber before they completed their purchase of the land—the "Butler tract" and the "Home Place"—from Myrick on the 27th day of December, 1907.

It is a well settled rule of law, as counsel for appellants contends, that the burden to prove notice is on him who alleges it, and whilst the fact of notice may be inferred from circumstances as well as proved by direct evidence, the proof must be such as to affect the conscience of one whose rights are by the notice made to depend, and must be so strong and clear as to fix upon him *mala fides. Crane's Nest Coal Co.* v. *Va. Iron Co.,* 108 Va. 869, 62 S. E. 954; *Vest* v. *Michie,* 31 Gratt. (72 Va.) 150, 31 Am. St. Rep. 722, and the authorities cited.

The facts set out in the statement of the case above are practically uncontroverted, and at least three witnesses examined in the cause have testified positively and directly that appellee, W. T. Carter, was given timely notice of the sale by Myrick of the timber in question to appellant and those associated with him in the timber business at the time, and that Carter purchased, and intended to purchase, only the land in the "Butler tract" and the "Home Place," exclusive of the saw timber thereon; and this testimony is contradicted by Carter alone. True a number of witnesses were examined in the cause on his behalf, but the testimony they gave is not only inconsistent with the position taken by appellant, W. T. Carter, and his conduct with respect to the timber in question, but is immaterial and irrelevant to the issue of fact involved. Myrick, the grantor of both appellants and appellee, testifies that he gave Carter, when he was negotiating a purchase of the "Butler tract" and the "Home Place," information that the timber thereon was sold to appellee and his associates, and that he sold the land itself to appellants and that it was so understood. This witness, shown to be a man of high standing in the county, having no interest in the result of the controversy with reference to which he was called upon to testify, further stated that, after this controversy was begun, appellant, W. T. Carter, made a state-

ment to him to the effect that at the time he (Carter) purchased the land he knew that the timber thereon had been sold to Barrett and others, and that in reply to an inquiry of Carter why he had set up a claim to the timber, Carter answered, "Well, I did say it, but I had to get some way to get to Mr. Thorp; he was moving the manure and playing the devil generally."

T. H. Barrett, one of the original purchasers of the timber in question, but at the time of his examination as a witness in this cause had no interest therein, and who it also appears is a prominent business man, holding an official position in the county of Southampton, testifies that he himself informed appellee, Carter, in November, 1906, of the purchase by witness and his associates of the timber on the land Carter was then proposing to buy more than a month before Carter purchased the land. There is some contradiction in the evidence as to when the alleged conversation between the witness and Carter took place, but no doubt is thereby left that it took place before Carter completed his purchase of the land. The witness further says that when he told Carter that the purchasers of the timber had the right to the use of ten acres of the land in the "Butler tract" for a sawmill site, Carter replied that if he bought the land the purchasers of the timber might have even more than the ten acres agreed on for the use of the mill, etc., a statement borne out by the acts and declarations of Carter after his purchase of the land and when Thorp went thereon to locate his mill plant. The witness, Barrett, was asked "Was, or not, there any question as to his (Carter's) understanding and knowing that you had bought this timber on November 9, 1906?" to which the witness replied, "None at all; he knew it." It is agreed in the record that this interview between the witness and Carter took place on November 5, 1906, instead of on the 9th, and it further appears that on that very day,

November 5, 1906, Carter had taken an option from Myrick's agent to buy the land at a stipulated price, nothing being said about the timber thereon. It further appears that before the taking of the option, Carter had solicited certain persons to buy the timber on the land so that he might be able to buy the land, and that it was only after Carter had been told by Myrick's agent that he was then in a position to sell him the land that Carter took the option to buy it.

Appellee, Thorp, testifies that in conversations with him, Carter recognized his right to the timber, and acknowledged information as to his purchase thereof, and in fact never made any objection to his cutting the timber until he went back in the fall of 1909 to cut what there remained uncut.

As stated, Carter denies the statements of the witnesses referred to as to notice to him of the sale of the timber in question, but the fact abundantly appears in the evidence that Carter stood by for two years or more and admittedly accepted the benefits of some of the provisions of the contract for the sale of the timber, and without any action on his part, though seeing the timber being cut and manufactured into lumber almost daily during a good part of that time, and on numerous occasions purchasing portions of this manufactured product, some of which, as he was obliged to know, came from the land in question. This conduct on his part is so manifestly inconsistent with the position he afterwards took that, when coupled with the other testimony in the case, the conclusion is irresistible that he had actual notice of the rights of appellant to the timber in question before he and his wife became complete purchasers of the land upon which this timber was standing and even before he (Carter) took an option to buy the land. He was asked as a witness in this cause, on cross-examination, for a statement of the reasons why he had

stood by, without objection, and allowed appellee, Thorp, to go ahead cutting the timber until it was nearly all cut and removed, and to do other things of which he was then complaining, if he believed that he bought and owned the timber on the "Butler tract" and the "Home Place," as well as the land, but to this inquiry he made no reply whatever.

We are of opinion that the proof in the case amply sustains the ruling of the circuit court in its decree complained of, and it, therefore, is affirmed.

*Affirmed.*